# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRYAN MCDERMOTT,

                  Plaintiff,

and

INDEPENDENT CARE HEALTH
PLAN,

            Involuntary Plaintiff,

v.

WAUKESHA COUNTY, WISCONSIN
MUNICIPAL MUTUAL INSURANCE
COMPANY, ERIC J. SEVERSON,
RYAN R. REINDERS, SONYA M.
SAHAGIAN, BRYAN M. SKAAR,
SEAN Z. LENARDIC, and
UNKNOWN EMPLOYEES OR
AGENTS OF WAUKESHA COUNTY,

                Defendants.

Case No. 15-CV-1341-JPS

**ORDER**

## 1.  INTRODUCTION

This litigation arises from events surrounding and following a 911 call placed by the plaintiff, Bryan McDermott ("McDermott"), in the early morning hours of April 6, 2015. He alleges that his civil rights were violated when a dispatcher for Waukesha County (the "County") sent both medical responders and sheriff's deputies to his home in response to his call, despite his request that only medical responders be sent. McDermott further alleges that the responding deputies entered and searched his home without

probable cause, used excessive force by employing a taser on him and kicking him in the head, and wrongfully arrested him by handcuffing and transporting him to a nearby hospital, where he was evaluated and eventually released.

This case was originally assigned to Judge Charles N. Clevert, and upon his retirement, was reassigned to Magistrate Judge Nancy Joseph. Then, upon non-consent to magistrate judge jurisdiction, the case was again reassigned, this time to this branch of the Court. The defendants thereafter filed a motion for summary judgment, and that motion is now fully briefed and ripe for adjudication. (Docket #37–62).

For the reasons explained below, the defendants' motion will be granted and this case will be dismissed.

2.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to demonstrate a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court construes

all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

**3.     RELEVANT FACTS**

Consistent with the standard of review, the following facts are taken from the evidence when viewed in a light most favorable to McDermott. Many of these facts are not necessary to the resolution of the defendants' motion, but their recitation is helpful to place the Court's analysis in context.

McDermott lives alone in Pewaukee, Wisconsin. (Docket #55 at 1–2). A car accident left him disabled, and he suffers from some significant health conditions, including a traumatic brain injury, chronic pain, and migraine headaches. *Id.* at 3. He takes several prescription medications to help control his medical conditions. *Id.*

On the evening of April 5, 2015, McDermott felt a migraine coming on. *Id.* at 4. He tried to weather it without taking medication, but as night fell and he could not sleep, he took some diazepam. *Id.* The diazepam proved insufficient, so in the early morning hours of April 6, McDermott took a nasal spray narcotic painkiller which, in the past, had provided quick relief and allowed him to sleep. *Id.* Unfortunately, the nasal spray had expired and caused him to feel acutely ill. *Id.* at 4–5. His vision blurred and he had difficulty moving and speaking. *Id.* at 5.

McDermott then called 911 several times, beginning just before 4:30 a.m. *Id.* at 6. The parties dispute how many times he called; the defendants

produced recordings of three calls, but McDermott says he remembers conversations with dispatch that are not on the recordings. (Docket #48 at 3). On his first call, McDermott told the dispatcher he was having a reaction to medication and wanted to know how to reverse the medication's effects. (Docket #55 at 6). He was asked for and gave his address, but when asked for his phone number, he expressed frustration that the dispatcher was not using Caller ID and cursed at her. *Id.* at 7. McDermott states that, at this point, the dispatcher hung up on him. *Id.* at 8. The dispatcher called McDermott back and McDermott, again using profanity, insisted that he did not want police officers dispatched to his home because he was afraid they would be violent and he did not want to go to prison. *Id.* at 8.

It is Waukesha County's general practice to dispatch both Waukesha County Sheriff's Department ("Sheriff's Department") deputies and emergency medical services ("EMS") personnel when someone calls the 911 dispatcher seeking medical assistance. (Docket #50 at 7–8). The County employs this practice in part because deputies are trained in CPR and may be the first to arrive and offer assistance to the person in need of care. *Id.* at 8. In addition, depending on the nature of the call and concerns for safety, deputies may have to secure the scene before EMS can enter a residence. *Id.* EMS often stage nearby the scene until deputies determine it is safe to approach. *Id.*

In keeping with this practice, sheriff's deputies responded to the dispatcher's radio call and arrived at McDermott's home shortly after his first 911 call. *Id.* at 8–9. EMS also reported to the scene and staged nearby, waiting for McDermott's home to be deemed safe for entry. *Id.* at 8. Deputy Ryan Reinders ("Reinders") yelled to McDermott to open his door. *Id.* at 10–11. The defendant deputies say that McDermott, who they could view

through front and back windows, was erratic, had an unsteady gait, had difficulty walking and balancing, and was agitated and belligerent. *Id.* at 10. Deputies Reinders and Bryan Skaar ("Skaar") say they believed McDermott was having a serious medical issue and may have been a danger to himself. *Id.* at 13–14.

Alarmed, McDermott called 911 again and told the dispatcher that he wanted the deputies to leave. (Docket #55 at 10–11). The dispatcher told McDermott that the deputies were trained first responders and that they could assist with his medication issue. *Id*. According to McDermott, he then retrieved his nasal spray and attempted to show it to Reinders through a window, but Reinders refused to acknowledge McDermott and continued to knock, insisting that he be let in. *Id.* at 11.

McDermott could see two flashlights in the backyard, belonging to deputies Skaar and Sean Lenardic ("Lenardic"), and upon walking to a window in the back of the house, he could see a deputy's handgun pointed at him. *Id.* at 12. McDermott then returned to the front door and told Reinders that this was all a mistake and that he needed medical assistance, not law enforcement. *Id.*

McDermott walked through his house to his attached garage to retrieve a toiletry bag, in which he kept a piece of paper that contained a list of his constitutional rights. *Id.* at 13. He placed the toiletry bag on his kitchen table and opened it, removing several bottles of medication. *Id.* at 13. Skaar says that he believed it was possible the bag contained a firearm. (Docket #44 at 5).

Meanwhile, the deputies at the front door continued to demand to be let in. Finally, Skaar broke a glass pane on the door, sending shattered glass into the entryway. (Docket #55 at 14). Skaar, Reinders, and Deputy

Sonya Sahagian ("Sahagian") entered through the front door. *Id.* Skaar instructed McDermott to come toward him, but because McDermott was not wearing shoes and did not want to step on broken glass, he refused to step forward. *Id.*

With several deputies screaming commands at him, McDermott says he feared for his life, and he retreated to the lighted kitchen with his hands over his head. *Id.* at 16. McDermott states that Skaar ordered him to face the kitchen table, lean over it with his legs spread, and place his hands apart on the table, and that he complied; Skaar denies that he gave these instructions and insists McDermott was noncompliant with commands to show his hands. *Id.* at 17.

Skaar then deployed his taser, hitting McDermott in the back. *Id.* at 18. McDermott fell to the ground. *Id.* The deputies who were present claim that McDermott hit his head on a counter on his way to the ground, but McDermott says this did not happen. *Id.* Skaar then approached McDermott and removed the taser prongs from his body, and McDermott was handcuffed and searched. *Id.* at 18–19. Then, McDermott says he could see a hand, arm, and boot approaching his face, and he was kicked hard in the head. *Id.* at 19. He says he briefly lost consciousness. *Id.* The defendants deny that either of these things happened. *Id.* at 19–20.

Deputies conducted a protective sweep of the home and found no one else there. *Id.* at 20. McDermott was then restrained on a gurney and taken to Waukesha Memorial Hospital. *Id.* at 20–21. Meanwhile, a couple of deputies stayed behind to search McDermott's home. *Id.* at 23. They ran the license plate numbers of two cars located in the garage and seized a personal handwritten note. *Id.* at 23–24.

At the hospital, McDermott was forced to provide a urine sample and he was given an IV line, though he does not recall receiving any medication or other substance through the line. *Id.* at 22. He was observed for several hours. *Id.* The deputies consulted with Waukesha County mental health personnel to determine if McDermott was a candidate for an emergency medical detention but were told there was no basis for such a detention. *Id.* at 22.

McDermott was discharged to the care of his partner, Helen Ceci. *Id.* at 22. But his pain continued and he had difficulty moving, so he went to the emergency room at Columbia St. Mary's Hospital later that day. *Id.* at 23. McDermott was diagnosed with what he calls a concussion and the defendants call musculoskeletal pain. *Id.*

## 4. ANALYSIS

### 4.1 McDermott's Claim Withdrawal

McDermott's first amended complaint (the "Complaint") alleges the following claims pursuant to 42 U.S.C. § 1983 against the individual defendants, which includes Reinders, Sahagian, Skaar, Lenardic, and John Doe agents of Waukesha County: violation of his right to substantive due process, unreasonable search and seizure, excessive force, and false arrest. (Docket #19 at 8–10). In addition to these federal claims, McDermott brings state law claims for assault and battery against the individual deputies. *Id.* at 12. He also brings a claim he titles "supervisory liability" against the County Sheriff, Eric Severson ("Severson"), in which he alleges that Severson failed to properly train and supervise the deputies. *Id.* at 10–11. McDermott also brings a claim for "indemnification," alleging that the County and its insurer are liable for any judgment entered against the individual defendants. *Id.* at 12–13.

Next, McDermott's Complaint alleges a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the County based on its failure to properly train and supervise deputies, (Docket #19 at 10), and based on policies, practices, and customs that "condoned and fostered the unconstitutional conduct of the individual defendants," *Id.* at 11–12. *Monell* provides an avenue for relief against a municipality for constitutional violations that are caused directly by a policy or custom of the municipality. *Monell*, 436 U.S. at 694. As a remedy for the harm allegedly caused by the offending practices, McDermott seeks damages, *id.* at 11, as well as declaratory and injunctive relief, *id.* at 13–14.

Curiously, in his brief opposing the defendants' motion for summary judgment, McDermott agreed to withdraw all of his federal claims except for the *Monell* claim against the County (and its insurer, which is not a proper party here) based on the policy or custom of the Sherriff's Department to respond to all calls for medical assistance with law enforcement. (Docket #48 at 9 n.7 and 25–26).[1] Specifically, McDermott states:

> Plaintiff does concede that he cannot maintain the Eighth Amendment claim, the due process claim, improper training/supervision, and claims against individuals (including Sheriff Severson) and unknown agents and ask that they be withdrawn. Plaintiff will continue to prosecute his claims collectively against Waukesha County and its insurer; while the claims of the individuals may be dismissed as redundant, their actions form the basis for action against

---

[1]Although the County's insurance company may be obliged to indemnify the County or County officials found liable in a suit under Section 1983, "the insurer is not an appropriate party to the suit because it is not a state actor, nor did it deprive [McDermott] of any constitutional rights while acting under the color of a state statute." *Wagner v. Washington Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007).

the municipality and Plaintiff is not conceding that the individuals did nothing wrong.

(Docket #48 at 9 n.7).

In other words, McDermott agreed to withdraw the following claims: all claims against Reinders, Skaar, Lenardic, Sahagian, Severson, and the Does; the Eighth Amendment excessive force claim[2]; the Fourteenth Amendment substantive due process claim; and, finally, the "failure-to-train" theory of *Monell* liability.[3] The defendants consent to withdrawal of

---

[2]In his Complaint, McDermott labeled his excessive force claim as one arising under the Eighth Amendment. (Docket #19 at 9). It appears McDermott agreed to withdraw his Eighth Amendment claim because, as the defendants point out in their summary judgment briefing, a claim of excessive force brought by a free citizen (as opposed to a pretrial detainee or prisoner) arises under the Fourth Amendment, not the Eighth Amendment. *See* (Docket #38 at 18); *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006). The Court assumes McDermott still believes the deputies used excessive force, but he acknowledges that the alleged misconduct implicates the Fourth Amendment.

[3]McDermott's Complaint does not specifically cast his "failure to train" claim as a claim against the County under *Monell*. Instead, McDermott brings an official capacity claim (in addition to an individual capacity claim) against Sheriff Severson for "supervisory liability." (Docket #19 at 3, 10–11). A suit against an officer in his official capacity "generally represent[s] only another way of pleading an action against [the] entity of which [the] officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Therefore, the Court can reasonably construe McDermott's "supervisory liability" claim against Severson as a *Monell* claim against the entity of which Severson is an agent, which is the County. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (describing a *Monell* theory of liability against a municipality for deprivation of rights caused by a failure to train employees). Ultimately, this matters little, because McDermott withdrew his "improper training/supervision" claim, as explained above. Any doubt about his intention to abandon a *Monell* claim against the County for failure to train or supervise is resolved by reference to the *Monell* section of his summary judgment opposition brief. *See* (Docket #48 at 25–26). There, McDermott advances his *Monell* claim based on the County's custom of sending deputies to medical emergencies but says nothing about the County's failure to train its deputies. *Id.*

these claims. *See* (Docket #54 at 1-2). The Court will accept the withdrawal and dismiss those claims with prejudice. *See* Fed. R. Civ. P. 41(a)(2).[4]

It also appears to the Court that McDermott has withdrawn his state law claims for assault and battery against the individual deputies. Specifically, McDermott states that he wishes to withdraw his "claims against individuals," and because the assault and battery claims are alleged against the individual deputies, those claims naturally fall within the category of claims withdrawn. Further, McDermott states that he is now prosecuting this action only against Waukesha County, and there has been, of course, no allegation that the County assaulted or battered McDermott. Despite this, the defendants, in their reply, address McDermott's assault and battery claims as if they are still pending. *See* (Docket #54 at 2).

Given the uncertainty in the parties' briefing regarding the status of the assault and battery claims, they will be dismissed without prejudice for two independent reasons: the claims appear to have been withdrawn but, even assuming they have not, the Court declines to exercise its

---

[4]McDermott did not ask that his withdrawn claims be dismissed with or without prejudice, and the defendants say nothing about prejudice either. McDermott also gives no reason why dismissal is necessary, apart from his statement that "he cannot maintain" those claims. In other words, McDermott concedes (rightfully or not) that the claims he seeks to withdraw are without merit. In light of that concession, and at the late stage of this case, dismissal with prejudice is appropriate. The defendants have invested significant time and resources in discovery, mediation, and summary judgment briefing, including moving for summary judgment on the claims McDermott now seeks to withdraw; dismissal without prejudice at this stage would be unfair to the defendants. *See Ratkovich By & Through Ratkovich v. Smith Kline*, 951 F.2d 155, 158 (7th Cir. 1991) (affirming dismissal with prejudice where plaintiff failed to produce evidence of causation sufficient to present a meritorious claim after two years of discovery). For all of these reasons, McDermott's withdrawn claims will be dismissed with prejudice.

supplemental jurisdiction over them because, as explained below, McDermott's only federal law claim will be dismissed. *See* 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction over state law claims when it has dismissed all claims over which it has original jurisdiction).

So where are we left after the dismissal of all these claims? The constitutional deprivations McDermott alleges he suffered at the hands of the defendant deputies now include excessive force, unreasonable search and seizure, and false arrest, all in violation of the Fourth Amendment. But he is not pursuing claims for those violations against any of the deputies individually. The only remaining defendant is the County. As the Court will discuss in greater depth below, the County cannot be held liable for the deputies' constitutional violations on a theory of *respondeat superior* or vicarious liability. *See Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986)). The only way McDermott can recover from the County for constitutional violations committed by its deputies is to prove that the County directly caused his constitutional harm. This is the basis of McDermott's *Monell* claim, which is the only remaining claim in the case.[5]

---

[5]A few additional words are necessary here about McDermott's dismissal of his individual capacity constitutional claims. McDermott apparently agreed with the defendants' argument that because McDermott's Complaint was "silent" as to whether his Section 1983 claims against deputies Reinders, Skaar, Lenardic, and Sahagian were individual or official capacity claims, those claims "must be construed as being in their official capacities." (Docket #38 at 4). For this proposition the defendants cite *Yeksigian v. Nappi,* in which the Seventh Circuit stated that "[i]n the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under color of law generally is construed as a suit against the defendants in their official capacities only." 900 F.2d 101, 104 (7th Cir. 1990). But this holding

The consequence for McDermott's suit is significant. To succeed on an individual capacity claim under Section 1983, McDermott would have had to prove the elements of the alleged constitutional violation (unlawful search and seizure, excessive force, false arrest), and prove that the deputies, acting under the color of state law, were personally responsible therefor. *See Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 469 (7th Cir. 2016). To succeed on his *Monell* claim, McDermott is required to prove a constitutional violation *and* prove that the constitutional violation was caused by the County's policy or custom. *See Matthews v. City of E. St. Louis,* 675 F.3d 703, 708–09 (7th Cir. 2012). In other words, McDermott has chosen only to pursue a claim that has an additional, and quite difficult, element of proof.

McDermott's factual submissions in opposition to the defendants' summary judgment motion may very well present disputes of material fact as to whether the defendant deputies violated McDermott's Fourth Amendment rights. But that is not enough to preclude the grant of summary judgment in this case. As explained below, even assuming *arguendo* that McDermott presented disputes of material fact as to the alleged constitutional violations, he cannot show those violations were

---

expressed in *Yeksigian* is no longer the law in the Seventh Circuit. Just one year after deciding *Yeksigian,* the Seventh Circuit held in *Hill v. Shelander* that "where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." 924 F.2d 1370, 1374 (7th Cir. 1991); *see also Davis v. City of Chicago*, 669 F. App'x 305, 306 (7th Cir. 2016) (explaining this change in Circuit precedent). But it is not the Court's job to save a party, especially a represented one, from himself. McDermott's intention to withdraw his individual capacity claims is clear and will be accepted.

caused by the County's policy or custom, and therefore his only remaining claim fails.

### 4.2 *Monell* Claim

As to the single remaining claim for *Monell* liability against the County, McDermott provides roughly one page of argument in his summary judgment opposition brief. *See* (Docket #48 at 25–26). McDermott claims that Waukesha County's custom of dispatching law enforcement to every call for medical assistance "invites the sort of constitutional and bodily abuses" that McDermott suffered. *Id.* at 26. In other words, McDermott argues that the County's custom causes constitutional violations such as unreasonable search and seizure, use of excessive force, and false arrest, and that this custom led to those very constitutional violations in *his* case.

Municipalities and other local government units are "among those persons to whom § 1983 applies," meaning they can be held liable for constitutional violations they cause. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029 (7th Cir. 2006) (quoting *Monell,* 436 U.S. at 690). However, *Monell* "places a *substantial* limitation on this liability." *Id.* (emphasis in original). A municipality cannot be liable under Section 1983 for a constitutional violation simply because its employees violate a plaintiff's rights. *Monell,* 436 U.S. at 694. In this sense, "a municipality cannot be held liable under Section 1983 on a *respondeat superior* theory." *Id.* at 691. Rather, "[m]isbehaving employees are responsible for their own conduct," and "'units of local government are responsible only for their policies[.]'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)).

To maintain a Section 1983 claim against a municipality, a plaintiff must first establish "the requisite culpability," which starts with identifying a "'policy or custom' attributable to municipal policymakers[.]" *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citing *Monell,* 436 U.S. at 691–94). A "policy or custom" may take one of three forms: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (quotation omitted).

The question of culpability is more nuanced in a case, like this one, where the plaintiff does not allege that the municipality's policy or custom is unconstitutional on its face, but instead alleges that the municipality's otherwise lawful policy or custom caused municipal employees to violate the law. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 406 (1997) (cautioning that *Monell* claims "not involving an allegation that the municipal action itself violated federal law . . . present much more difficult problems of proof."). To ensure that *Monell* claims in this category do not collapse the distinction between municipal liability and *respondeat superior* liability, the Supreme Court has instructed the judiciary to "adhere to rigorous requirements of culpability and causation" when evaluating them. *Id.* at 415.

More specifically, the Supreme Court instructs that "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate

indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* at 407 (quotation omitted). In other words, the plaintiff must present evidence either (1) that it was obvious to the municipality that constitutional violations would likely flow from the challenged policy, or (2) that because of repeated instances of constitutional violations in fact flowing from the policy, the municipality was on notice that the policy, though lawful on its face, had failed to prevent constitutional torts. *Id.* at 409–10.

Finally, in addition to proving the existence of a policy or custom and the requisite culpability, the plaintiff must also prove "the requisite causation," which means that "the policy or custom was the 'moving force' behind the constitutional deprivation." *Gable*, 296 F.3d at 537. To show that the municipality's custom was the "moving force" behind his injury, the plaintiff must show "a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404. Presenting evidence that a municipality's custom is a "but for" cause of his alleged injury is insufficient as a matter of law. *See Wilson v. Cook Cnty.*, 742 F.3d 775, 784 (7th Cir. 2014) ("[T]he decision to hire [a public official] was not the cause of [the plaintiff's] injury in anything but the 'but for' sense. It was not, in other words, the 'moving force' behind the injury.") (internal citations omitted). The Seventh Circuit has said that a "moving force" must be the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cnty.*, 526 F. App'x 692, 696 (7th Cir. 2013).

The County does not dispute that its "general practice" (though apparently not its express policy) is to send both deputies and EMS to respond to 911 calls requesting medical assistance. *See* (Docket #54 at 4–8). McDermott does not allege that this custom is itself unconstitutional.

Instead, McDermott alleges that the custom "invites" deputies to violate the constitution. McDermott's effort to create a jury question on this claim borders on nonexistence. In support of his *Monell* theory, McDermott cites to just two paragraphs from the *defendants*' proposed findings of fact. Those factual statements, which are supported by testimony in the form of affidavits from various County officials, are as follows:

> It is not uncommon for an individual who intentionally takes too much medication to later claim that it was accidental. An individual who is suicidal could pose a threat to themselves and to responding officers. An individual who is suicidal is more likely to pose a threat than someone who accidentally overdosed because if they are willing to kill themselves, they often are willing to kill others.

> If an individual would call the 911 Waukesha County dispatcher for medical assistance, both EMS and Waukesha County deputies would respond.

(Docket #39 at 5).

That is the totality of the evidence McDermott presents in support of his claim that the County's custom of sending deputies to medical calls caused him to suffer constitutional violations including unreasonable search and seizure, excessive force, and false arrest. *See* (Docket #48 at 25–26). Based on these facts, McDermott argues that this custom "invites" constitutional abuses because it "creates a situation where officers are trained to fear everyone, but especially those with special medical or mental needs." *Id.* at 26. If "every impaired person is seen as a homicidal maniac, if every Dopp kit potentially contains a disassembled semi-automatic rifle, if nobody calling for medical help can be presumed to simply want medical help," McDermott argues, "then incidents of police violence such as this one are foregone conclusions." *Id.* None of these statements, found in

McDermott's summary judgment opposition brief, are supported by a citation to evidence beyond the paragraphs quoted above.

First, as to the culpability element of a *Monell* claim, McDermott's cited evidence proves nothing. McDermott does not even allege, much less present evidence to prove, that the risk of constitutional violations stemming from the County's custom was obvious. *Cf. Harris*, 489 U.S. at 390 n.10 (because it is a "moral certainty" that police officers "will be required to arrest fleeing felons," "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."). Nor does McDermott allege or provide evidence that other people suffered constitutional violations that stemmed from the challenged custom, thereby putting the County on notice of the need to change custom. *Cf. Brown*, 520 U.S. at 407–08 (1997) (a pattern of similar constitutional violations by the municipality's employees can demonstrate that the municipality was deliberately indifferent to the consequences of its action). McDermott's April 6, 2015 encounter with County deputies is the only incident he mentions. McDermott has not met his burden to create a jury question as to the County's culpability in regard to the constitutional violations flowing from its challenged custom of sending deputies to the scenes of medical emergencies.

Second, as to the causation element of a *Monell* claim, McDermott's cited evidence suggests, at best, nothing more than but-for causation. It may be true that but for the County sending deputies to 911 medical calls, deputies would not otherwise respond to the homes of people in need of medical attention and therefore would not have occasion to violate their constitutional rights. But that is as far as McDermott's evidence takes him,

and that is not far enough. *See Wilson*, 742 F.3d at 784 (but-for causation is not sufficient to prove a *Monell* claim). McDermott presents no evidence that the mere presence of deputies at the scene of a medical emergency will cause those deputies to enter homes without probable cause, use excessive force on those inside, and make false arrests. Indeed, no one has suggested that it is the County's custom to send deputies to the scene of a medical emergency and direct that they immediately enter a residence without cause. Nor has anyone suggested that it is the County's custom to direct deputies to deploy their tasers on people who have called 911 for medical assistance. It is the County's custom to dispatch deputies to the scene of a medical emergency to act as first responders and to ensure the scene is safe for EMS to enter. Nothing about that is unconstitutional or necessarily invites unconstitutional behavior.

The Supreme Court addressed this problem of causation decades ago in *Tuttle* when it warned that "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official." *Id.* For example, in that case, the police officer who shot and killed the plaintiff's husband would never have done so if the city for which he worked did not have a "policy" of establishing a police force. *Id.* "But *Monell* must be taken to require proof of a city policy different in kind from [that] example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.'" *Id.* At the very least, the plaintiff must show "an affirmative link between the policy and the

particular constitutional violation alleged." *Id.* In much the same way that any constitutional violation committed by police could be traced back to a municipality's "policy" of having a police force, McDermott's constitutional injuries could be traced back to the County's custom of sending deputies to the scene of medical emergencies. But, as in *Tuttle*, McDermott cannot succeed on a *Monell* theory stated at that level of generality.

Ironically, McDermott does refer in his briefing to another of the County's policies that is more directly linked to the events of April 6, 2015, but it actually undermines his claim. McDermott argues that the search of his home after he was handcuffed was "far more invasive then either department policy or the Fourth Amendment permit." (Docket #48 at 23). He cites to the Sheriff's Department operating procedures, which instruct that a protective sweep of a home may be conducted after an arrest inside the home, and he argues that because the deputies did not believe they had made an arrest, they acted in contravention of the County's policy when they conducted the unconstitutional search of his home and person. *Id.* In other words, McDermott argues that the County's relevant policy would have, if followed, *prevented* a constitutional violation. A curious argument, considering McDermott's goal for his only remaining claim is to pin the deputies' wrongdoing on the County.

In sum, McDermott has failed to create a jury question on the culpability and causation elements of his *Monell* claim. Because the claim fails on those elements, the Court need not decide whether McDermott created a jury question on the underlying Fourth Amendment violations that he asserts were caused by the County's custom of sending deputies to medical emergencies.

As the Seventh Circuit has warned time and again, summary judgment the "'put up or shut up' moment in a lawsuit," requiring "a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotation omitted). "Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Id.* McDermott has not met this burden for the only federal claim he has not already withdrawn. The defendants are, therefore, entitled to summary judgment.

5. **CONCLUSION**

Beyond the foregoing analysis, McDermott has withdrawn all individual claims, along with his Fourteenth Amendment due process claim and his improperly-pled Eighth Amendment claim. Those claims will be dismissed with prejudice.

McDermott's *Monell* claim against the County will also be dismissed with prejudice, as McDermott has failed to create a jury question on the culpability and causation elements of that claim.

Finally, having dismissed all of McDermott's federal law claims, the Court declines to exercise supplemental jurisdiction over McDermott's state law assault and battery claims. 28 U.S.C. § 1367(c)(3); *see also Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction[.]").

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #37) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's federal law claims be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the plaintiff's state law claims be and the same are hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of May, 2018.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge